UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                                           :

UNITED STATES OF AMERICA,                :

                                                           :                S2 03 Cr. 781 (CSH)

             - against -                         :

                                                           :                MEMORANDUM

                                                           :

SAMUEL SANEAUX and RAFAEL ESTRELLA,  :

                                                           :

                      Defendants.        :

                                                           :
------------------------------------------------------------ x

<u>HAIGHT, Senior District Judge</u>:

      A second superseding indictment charged defendants Samuel Saneaux and Rafael Estrella with conspiring to accept bribes in order to secure individuals an apartment in Andrews Plaza, a federally subsidized housing project located in the Bronx. In addition to the conspiracy charge, both defendants were charged with several related substantive offenses. Following trial the jury convicted Saneaux on the conspiracy charge but was unable to reach a verdict on the substantive charges against him and on any of the charges against Estrella. The Court declared a mistrial as to those charges.

      During its case in chief, the government offered several out of court statements to prove the truth of the matters asserted therein. These statements were made by alleged coconspirators of defendants Estrella and Saneaux, and were conditionally admitted into evidence pursuant to the hearsay exemption in F.R.E. 801(d)(2)(E) and consistent with the procedure established in *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028 (1970). After closing arguments, and outside the presence of the Jury, I ruled that that government had satisfied the preliminary requirements for the admission of

coconspirator hearsay statements and I admitted those statements. *See United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir. 1993).

Given the conviction of Saneuax and the possible retrial of Estrella on the conspiracy charge, in this opinion I summarize the evidence upon which I relied and state my reasons for making that ruling on admissibility.

### I. Background

I have had occasion to address this issue in two prior opinions, *United States v. Saneaux*, 365 F.Supp.2d 488 (S.D.N.Y. 2005) (*Saneaux I*), and *United States v. Saneaux*, 365 F.Supp.2d 493 (S.D.N.Y. 2005) (*Saneuax II*), familiarity with which is assumed.

In *Saneaux I*, I required the parties to address what was principally a procedural question: should the Court adjudicate defendants' motion to preclude the coconspirator statements prior to trial or, alternatively, should the Court follow what I called the "*Geaney* protocol"[1] and admit the contested statements subject to connection? In a hearing held on this question on April 6, 2005, the government argued that I ought to follow *Geaney* and admit the coconspirator hearsay statements subject to connection. The defendants contended that sufficient evidence existed in the parties' written submissions demonstrating that the hearsay statements could not possibly meet the preliminary requirements for admission pursuant to F.R.E. 801(d)(2)(E), and in consequence, I should preclude the statements based solely upon the parties' written submissions.

In *Saneaux II*, I ruled on defendants' motion to preclude the coconspirator statements. In point of fact, the contested coconspirator statements which I have heretofore referred to in the aggregate, actually comprise two distinct categories of statements.

---

[1] *See United States v. Geaney*, 417 F.2d at 1116, an opinion by Judge Friendly that has instructed district judges in this circuit ever since.

The first category includes only those declarations contained in transcripts of recorded conversations between an unindicted coconspirator, Robert Grullon, and government agents. In *Saneaux II*, I held that the paucity of the government's proof that the recorded Grullon declarations were made in furtherance of a conspiracy – the final preliminary requirement for the admission of a coconspirator statement – required that the government first,

> elicit and place before the jury all the evidence it will rely upon to satisfy all prerequisites of admissibility, including the 'in furtherance' requirement, so that I may hear counsel argue the issue and rule upon the admissibility of the recorded Grullon declarations *before* those declarations are placed before the jury.

*Saneaux II*, 365 F.Supp.2d at 504 (emphasis added). Perhaps as a result of this instruction, the government did not offer any of the recorded Grullon declarations at trial. Consequently, I had no occasion to rule upon their admissibility at trial and they are not considered further in this opinion

The second category of coconspirator statements is comprised of other, non-recorded statements of alleged coconspirators, including defendant Estrella[2] and unindicted coconspirators Lucia Rodriguez,[3] Ernesto Gonzalez,[4] someone known only as "Abou,"[5] and Grullon.[6] In

---

[2] The hearsay declarations of defendant Estrella were admitted against Estrella himself pursuant to Rule 801(d)(2)(A) of the Federal Rules of Evidence, which provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is (1) the party's own statement . . . ." However, Estrella's declarations were also offered against defendant Saneaux pursuant to Rule 801(d)(2)(E) as the statements of a coconspirator. Marcia Gil testified that she paid $4,000 to Estrella in order to secure Gil an apartment in Andrews Plaza. Tr. 691. In her testimony, Gil recounted a number of statements allegedly made by Estrella during the course of securing Gil a subsidized apartment in Andrews Plaza. *See* Tr. 693-97, 700, 702, 704-05, 710, 712-14, 797.

[3] Candita Vasquez testified that Lucia Rodriguez solicited and accepted $4,000 in order to secure an apartment for Vasquez at Andrews Plaza. Tr. 921. During her testimony, Vasquez related numerous statements allegedly made by Rodriguez during the course of this transaction. *See* Tr. 920-21, 925, 933-34, 937-39, 942, 944, 973, 976.

[4] Cesar Mendez testified that Gonzalez solicited and collected $3,500 in order to secure Mendez an apartment in Andrews Plaza. Tr. 571. During his testimony Mendez recounted a series of statements allegedly made by Gonzalez in the course of this transaction. *See* Tr. 573-75, 590-91.

[5] Reynaldo Santana testified that a "porter[]" or "attendant[]" at Andrews Plaza known to him as "Abou" gave Santana the number for the Andrews Plaza offices. and told Santana that he would have to "give him some money in order to make some arrangements." Tr. 511. This is the only instance in which out of court statements attributed to "Abou" were offered into evidence. In fact, Abou did not have any role in the transaction to which Santana testified: he testified that he secured a subsidized apartment through the payment of $1,500 directly to Saneaux. Tr. 516-18. Based on the foregoing, it is apparent that the statements attributed to Abou were not, in fact, offered for their truth, but rather were offered to explain subsequent events, such as Santana's call to what he later learned were the Andrews Plaza offices,

*Saneaux II*, I held that this category of coconspirator statements would be subject to the traditional *Geaney* protocol; that is to say, I conditionally admitted the statements, subject to connection. At the close of trial, and outside the presence of the Jury,[7] I first reiterated that the recorded statements of Grullon were never offered, and then proceeded to raise the question of admission of the other non-recorded coconspirator statements *sua sponte*.

> In point of fact, the government rested without having offered the Grullon tapes. My question now is this and I'll put it first to the government. Are there any [other] coconspirator declarations in the record concerning which I am now under the obligation to make a *Geaney* finding on the record, and if so, what are those declarations and against whom were they offered?

Tr. 1043. The parties first identified the statements of Estrella, Rodriguez, Gonzalez, "Abou" and Grullon. Tr. 1044, 1046-50. After hearing arguments from all parties on whether the preliminary requirements for admission of these 801(d)(2)(E) statements had been met, I found that the evidence in the record, including the statements themselves as well as other evidence not presented at trial, was sufficient to satisfy the prerequisites for admission of the hearsay declaration of a coconspirator. Tr. 1054. Upon making this ruling at trial, I explained that "in order that there be a full record for possible appellate review, I'll write an opinion explaining my

---

and his arrangements to pay Saneaux for the apartment. As such, the statements attributed to Abou were not offered for their truth, and were admitted as non-hearsay.

[6] Erika Reyes testified that Grullon collected $1,500 in order to secure Reyes a subsidized apartment in Andrews Plaza. Tr. 387. During her testimony, Reyes recounted a series statements she testified were made by Grullon during the course of this transaction. *See* Tr. 388, 391-93. In addition, Evelyn Morales testified that she paid $4,500 to a person she identified only as "Robert." Tr. 601. According to Morales, Robert was the husband of a woman named "Yuberkis." *Id*. In Grullon's proffer statements – which were never introduced into evidence – Grullon identifies Yuberkis Sotomayor as his ex-wife. Defendant Sanueaux's Motion *in Limine*, Ex. A, Ex. B. In addition, in his proffer statement, Grullon admits to securing Evelyn Morales an apartment in Andrews Plaza. *Id*. While Grullon's proffer statement was not admitted into evidence at trial and he did not testify, I may consider this statement in the present analysis because, as noted in Part II, in performing it I am not limited to a consideration of admissible evidence. Based upon all the evidence, I find that the "Robert" referred to by Morales is Robert Grullon. During her testimony, Morales testified to a series of statements she asserted were made by Grullon in the course of their negotiations concerning the Andrews Plaza apartment. *See* Tr. 601, 604-05, 607-14, 631, 633-34.

[7] *See United States v. Tracy*, 12 F.3d 1186, 1200 (2d Cir. 1993) ("When the government has persuaded the judge that the prerequisites for admission of coconspirator statements have been established, the judge should make his *Geaney* findings outside the presence of the jury, and the jury should not be told what facts the judge believes have been established.")

reasoning." Tr. 1055. This is that opinion.

## II. Discussion

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in pertinent part:

> (d) Statements which are not hearsay. A statement is not hearsay if –
> . . .
> (2) [t]he statement is offered against a party and is . . . (E) a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

"Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (emphasis added). In order for a statement to fall within the definition of 801(d)(2)(E), "a court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir. 1993). These prerequisites to admission of an 801(d)(2)(E) statement are "[p]reliminary questions concerning ... the admissibility of evidence" as referenced in Fed.R.Evid. 104(a), and must be proven by a preponderance of the evidence. *Bourjaily,* 483 U.S. at 176, 107 S.Ct. 2775; *United States v. Daly,* 842 F.2d 1380, 1386 (2d Cir. 1988) *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988).

In determining whether the 801(d)(2)(E) prerequisites have been proven by a preponderance of the evidence, the Court may consider the coconspirator statements themselves. However, because "these hearsay statements are presumptively unreliable," *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir.1996), there must be independent corroborating evidence of

"the existence of the conspiracy and the participation therein of the declarant and the [defendants]." Fed. R. Evid. 801(d)(2)(E).

The quantum of independent evidence required to satisfy these preliminary requirements is not necessarily onerous. *See United States v. Ginsberg,* 758 F.2d 823 (2d Cir. 1985); *United States v. Provenzano,* 615 F.2d 37 (2d Cir. 1980); *United States v. Ragland,* 375 F.2d 471 (2d Cir. 1967). In cases where "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." *United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000).

Finally, the Court need not limit its deliberations only to admissible evidence. Rule 104(a) of the Federal Rules of Evidence provides that the court "is not bound by the rules of evidence except those with respect to privileges." As observed by the Supreme Court in *Bourjaily,* "[t]he Rule on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege." *Bourjaily*, 483 U.S. at 178.

What follows is a summary of the evidence upon which I based my ruling at trial that the preliminary requirements for admission of a coconspirator statement had been proved by a preponderance of the evidence.

A.   <u>Existence of the Conspiracy</u>

The trial record is replete with evidence demonstrating the existence of a conspiracy to solicit and accept bribes in exchange for promises of favored treatment in the assignment of subsidized housing at Andrews Plaza. The government's first witness, Carol Maitland, a chief project manager at the U.S. Department of Housing and Urban Development ("HUD"), testified about significant irregularities in the assignment of housing at Andrews Plaza, such as the

application of preferences to certain prospective tenants' applications, when those preferences had already been abolished by Congressional action.[8] Tr. 67-68, 93-155. David Baron, a supervisor at Metro Management – the entity which manages Andrews Plaza and Saneaux's former employer – testified that after Congress eliminated these preferences, no preferences were in use at Andrews Plaza. Tr. 440. The improper use of preferences in the application files of witnesses who claim to have paid a bribe, therefore, supports the existence of a conspiracy. A parade of tenants also testified that they personally had paid bribe money for favorable treatment in the assignment of subsidized housing at Andrews Plaza. *See, e.g.*, Tr. 385, 423, 503, 569, 689, 916. Evidence outside the trial record also supports the existence of this conspiracy. Foremost among this evidence are the proffer statements of Robert Grullon. *See* Memorandum of Interview of February 6, 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. A; Memorandum of Interview of February 24. 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. B. Therein, Grullon describes a series of bribe transactions in detail and inculpates himself and Saneaux, among others, in those transactions. Taken together, this evidence established the existence of this conspiracy by a preponderance of the evidence, satisfying the first preliminary requirement for the admission of a coconspirator statements.

B.   Participation of Defendants and Declarants in the Conspiracy

Similarly, significant evidence established the participation of defendants Saneaux and Estrella, and declarants Rodriguez, Gonzalez and Grullon, in this conspiracy.[9]

---

[8] Prior to October 1998, there were three Congressionally-mandated preferences, which allowed subsidized housing applicants to bypass the first-come-first served model of assigning Section 8 apartments. Tr. 66-68. In addition, owners of subsidized housing could institute their own preferences so long as they were consistent with anti-discrimination and fair housing laws, so long as these preferences were included in the owner's tenant selection plan. *Id*. The mandatory preferences were eliminated in October 1998 and Andrews Plaza never instituted owner's preferences. Tr. 82. At trial, the government contended that Saneaux employed the use of preferences to cover up his manipulation of the waiting list.

[9] The declarations of that individual known only as "Abou," were admitted as nonhearsay. *See supra* n.5.

1. The Defendants

Defendant Saneaux's participation in this conspiracy is supported, first, by the testimony of in-court witnesses, including Candita Vasquez and Reynaldo Santana, who testified to paying bribe money directly to Saneaux. *See* Tr. 516-18, 935-36. Second, there is evidence linking Saneaux to the conspiracy in which intermediaries either explicitly or implicitly refer to Saneaux as the ultimate recipient of the bribe money. *See, e.g.,* Government Letter in Opposition to Defendants' Motion *in Limine*, February 21, 2005, *at* 2 ("Grullon is recorded telling the [government agents that] he was merely a middleman for the 'manager' or 'owner' of Andrews Plaza; that most of the money goes to this manager . . . ."); trial testimony at Tr. 694 ("Q. [AUSA Gerschwer] What, if anything, did Mr. Estrella say about who he was going to give the money to? A. [Marcia Gil, a tenant] Yes, he said the money was going to be given to the manager of Andrews Plaza. Q. Did he use any name? A. Yes. Q. What name. A. Samuel."). In addition, the proffer statements of Grullon relate a series of transactions in which he serves as the intermediary between prospective tenants and Saneaux himself.[10] Memorandum of Interview

---

[10] I may consider Grullon's proffer statements in this context, though following *Crawford v. Washington,* it is unlikely that proffer statements by a non-testifying witness would be admissible at trial. 541 U.S. 36, (2004), *abrogating Ohio v. Roberts,* 448 U.S. 56 (1980); *but c.f. United States v. Lung Fong Chen*, 393 F.3d 139, 150 (2d Cir. 2004) ("Nevertheless, we need not determine at this stage whether the results of a failed proffer session fall within this loose definition.")

In *Crawford*, the Supreme Court held that "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59. Though the Court declined to provide categorical guidance about what constituted 'testimonial' statements, its discussion indicated that certain statements, including those in response to "interrogations by law enforcement officers," *Crawford,* 124 S.Ct. at 53, and plea allocutions, *see United States v. McClain,* 377 F.3d 219, 220 (2d Cir. 2004), "fall squarely within" the testimonial class. 541 U.S. at 36; *U.S. v. Jones*, 393 F.3d 107, 110 (2d Cir. 2004). With respect to statements made during police interrogations, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51. Hence, such statements are inadmissible under *Crawford*, unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant.

It appears then beyond dispute that proffer statements – like statements made during plea allocutions and in response to law enforcement interrogations – fall squarely within the class of testimonial statements, the admission of which is limited by the holding in *Crawford*. However, because F.R.E.104(a) expressly permits the Court to consider otherwise inadmissible evidence which is unrelated to privileges, I do consider the contents of Grullon's proffer statement in this context.

of February 6, 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. A; and Memorandum of Interview of February 24. 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. B.  Finally, the evidence of irregularities in Metro Management's record keeping including the use of fictitious preferences, *see supra* II.A, when read together with the testimony of an Andrews Plaza employee who reported to Saneaux, Julisa Carcano, in which she states that Saneaux had exclusive responsibility for maintaining those records and assigning apartments, also evinces Saneaux's participation in this conspiracy.  Tr. 891-93.  This evidence underlaid my ruling that Saneaux's participation in this conspiracy had been established by a preponderance of the evidence.

The evidence supporting defendant Estrella's participation in the conspiracy – though certainly less prolific than that inculpating Saneaux – is adequate to meet the preponderance of the evidence standard.  First, there is the testimony of Marcia Gil in which she describes, in some detail, Estrella's role as intermediary during the transaction in which she secured an apartment at Andrews Plaza.  Tr. 693-97, 700, 702, 704-05, 710, 712-14, 797.  Second, there are Estrella's own statements as recounted by Gil at trial and admitted by this Court as party admissions.  *Id.*  Finally, there is the testimony of Julisa Carcano, the Andrews Plaza employee, who testified that Saneaux only permitted access to a small group of family and associates whom he would deal with directly.  Tr. 893.  That list of twelve individuals included Estrella, as well as Grullon, Gonzalez and Rodriguez.  *Id.*  Carcano testified that during her employment at Andrews Plaza, Estrella visited the office "[m]aybe twice a month."  Tr. 894.  This evidence, moreover, must be viewed in the light cast upon it by the entirety of the available evidence.  In that light, it is clear that the *modus operandi* described by Gil in her description of the transaction involving Estrella is nearly identical to that described by numerous other government witnesses in relation

to their bribe payments. Credibility is thus lent to Gil's rendition based upon its similarity to the experience of other bribe payers, and, together with the foregoing, supported my finding that Estrella's participation in this conspiracy was established by a preponderance of the evidence.

The implications of this finding are two-fold. First, it satisfies the second preliminary requirement for the admission of the coconspirator statements of Rodriguez, Gonzalez and Grullon against Estrella himself. Second, because Estrella's hearsay declarations were offered against his co-defendant Saneaux, Estrella's participation in the conspiracy – in this circumstance, as the declarant – also serves to satisfy the second preliminary requirement for the admission of Estrella's hearsay declarations against Saneaux.[11]

2.  The Declarants

The participation of Rodriguez, Gonzalez and Grullon – *i.e.* those individuals whose out-of-court declarations were offered for their truth, and introduced through in-court witnesses at trial – in the charged conspiracy was also established by a preponderance of the evidence.

Rodriguez's[12] participation in the conspiracy was established by Candita Vasquez, who testified in some detail about Rodriguez's role facilitating the payment of a $4,000 bribe in order to secure a subsidized apartment in Andrews Plaza. Tr. Tr. 920-21, 925, 933-34, 937-39, 942, 944, 973, 976. Vasquez further testified that significant portions of her Andrews Plaza application had been completed by Rodriguez, and contained false information used to justify a preference to allow Vasquez to bypass others on the waiting list.[13] Tr. 926-932. Evidence of Rodriguez's participation is bolstered by the testimony of Julisa Curcano that Rodriguez was one

---

[11] Estrella's statements were admitted against himself as party admissions pursuant to F.R.E. 801(d)(2)(A). *See supra* n.2.

[12] Lucia Rodriguez did not testify at trial because she was killed in the November 12, 2001 crash of American Airlines flight 587, en route to Santo Domingo in the Dominican Republic.

[13] *See supra* n.8.

of the few tenants who had direct access to Saneaux. Tr. 894 ("Lucia Rodriguez called almost every day. And, also, from time to time . . . [c]ame to the office.").

Gonzalez's[14] participation in the conspiracy was established by Cesar Mendez, who testified that he paid $3,500 to Gonzalez in order to secure a subsidized apartment at Andrews Plaza, Tr. 571, and also testified that there were portions of his application – relating to preferences – which he had never before seen and which were not in his handwriting. Tr. 577-79. And, as with Estrella and Rodriguez, Gonzalez was on Curcano's "list" of individuals who were allowed unfettered access to Saneaux. Tr. 893.

Erika Reyes and Evelyn Morales each testified that they paid $1,500 and $4,500 respectively to Grullon[15] in order to secure an Andrews Plaza subsidized apartment. Like witnesses Mendez and Vasquez, Reyes and Morales testified that there were significant irregularities in their applications. Tr. 395-404, 614-24. Grullon was also on the list of those with access to Saneaux. Tr. 893. However, the most significant evidence of Grullon's participation in this conspiracy is contained within his proffer statements in which he admits to an active and continuing role as an intermediary between Saneaux and prospective tenants in this conspiracy to sell subsidized apartments. Memorandum of Interview of February 6, 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. A; Memorandum of Interview of February 24. 2003, *in* Defendant Saneaux's Motion *In Limine*, Ex. B.

The foregoing evidence establishes by a preponderance of the evidence that Rodriguez, Gonzalez and Grullon, along with defendants Saneaux and Estrella, were members of the

---

[14] Gonzalez did not testify at trial. The government stated that they could not locate him and suspected that he had returned to the Dominican Republic.

[15] Grullon was not called by either party at trial, and is presently incarcerated pursuant to an agreement with the government to plead to criminal charges arising out the facts which are the subject of this case.

conspiracy to sell subsidized apartments in Andrews Plaza, thereby satisfying the second preliminary requirement.

C. <u>Statements Were Made During the Course of and In Furtherance of the Conspiracy</u>

The final preliminary requirement for the admission of a coconspirator statement – that the statement be made during the course and in furtherance of the conspirary – was the focus of my opinions in *Saneaux I* and *Saneaux II*.

A statement made during the course of a conspiracy is made while the conspiracy is active: after its formation and before its cessation. *See United States v. Grossman*, 843 F.2d 78, 83 (2d Cir. 1988). Here, the superceding indictment alleges that the conspiracy was active "[f]rom at least in or about 1995 up to and including at least in or about February 2003." Superceding Indictment, *in* Defendant Saneaux's Motion *In Limine*, Ex. F. The proof at trial established that the charged conspiracy was in existence and functioning between those dates. The coconspirator statements which are the subject of this opinion were made during the same time period. Hence, the hearsay declarations were made during the course of the conspiracy.

The "in furtherance" requirement for admission of a coconspirator statement requires that the statement be designed to promote the accomplishment of the conspiracy's goals. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). "[C]ommunicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals is also in furtherance of the conspiracy." *United States v. Rivera,* 22 F.3d 430, 436 (2d Cir. 1994). The objective of the charged conspiracy was allegedly to solicit and accept money from prospective tenants, in exchange for which the conspirators, principally Saneaux, would help the bribe payers secure a subsidized apartment in Andrews Plaza. The contents of each coconspirator statement introduced at trial concerned the amount of money, and

the logistics of the payment of that money, which the bribe paying prospective tenants were required to make in order to secure their apartment. These statements were surely made to advance the goals of this particular conspiracy; in other words, they were made in furtherance of the conspiracy.

For these reasons, I found that the coconspirator statements were made both during the course and in furtherance of this conspiracy, satisfying the final preliminary requirement.

### III. Conclusion

Based upon the evidence reviewed herein, I found that each of the preliminary requirements for the admission of a coconspirator statement pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence had been satisfied by a preponderance of the evidence. Therefore, at the close of trial, and outside the presence of the Jury, I admitted these statements into evidence pursuant to the *Geaney* protocol.


Dated: New York, New York
July 18, 2005

_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE